Good morning, and may it please the Court. I'd like to begin with the two claim construction issues, the meaning of substantially conical and of attached, before turning to the exclusion of jurors expert. Beginning with substantially conical, that term does not exclude any curvature no matter how slight. The District Court gave conical its plain and ordinary meaning, resembling a cone in shape. Widely familiar shapes have a slight curvature, even though we would easily recognize them as conical in form. There's the images on page 36 of our brief, the canine tooth, the tapered cone, a cinder cone volcano is recognizably conical, even though it's not perfectly, there may be curvature, and the cone heads from Saturday Night Live. The heads are recognizably conical, notwithstanding some slight curvature. But the modifiers substantially and generally make clear that such departures are permitted. Those are terms of approximation. They have well-established meanings, meaning about, largely, substantially, and that comfortably covers slight curvatures in what would otherwise be a peripheral cone. In your view, it would be substantially, it could include slight curvature, it would be up to a fact finder to determine whether something satisfied that claim limitation? I think that's right. I think it goes to the finders of fact. A skilled artisan could determine looking at something, whether it is conical in form and substantially so, and that would just go to the jury. Certainly, under the claim, other than excluding curvatures, the constructions here could have gone to the jury to make that determination. Finally, it's really especially inappropriate for the District Court to say you can't have curves, when the District Court also said you could have sharp angular deviations. That simply doesn't reconcile, it doesn't line up with the purpose of the patent, which is to reduce flow deviations. The District Court recognized that those sharp deviations would introduce sharp deviations, and they would actually cause non-laminar flow, contrary to the intentions of the patent. If I could turn quickly to- Can I ask you something real quickly? Where it says that the conical, generally conical oval of flow surface has a generally constant flow angle, does that help define what it is that generally constant flow angle suggests that there could be some modification of the angle? It just has to be generally constant? Am I understanding that correctly? That's correct. Generally constant doesn't mean perfectly straight, no change at all. It always says generally or substantially as a modifier in the claims. But I think critically, those are distinct terms, although they're related. Generally constant flow angle doesn't appear in all the claims, it appears in only some. It's not always there like the substantially conical. And if you look at Claim 1, for example, it's on Appendix 114, Column 5. It says having a generally constant flow angle relative to the atomizing edge. And that atomizing edge is sometimes called the spray edge. So it's got to be relatively, generally constant relative to that outer edge at one point. So you can't vary too much off that. But it doesn't mean that you can't have any curvature whatsoever. Turning then to the term attachment. The district court erred in narrowing the term attached to two pieces that came together. This is not a product by process claim. It's an apparatus claim. It's about what the device is, not about how the device came to be. So if you say, does it have a rear cover? Yes. Is it attached to the bell? Yes. Does it produce a hollow device? Yes. Then it fits that the claim is satisfied. It departs from ordinary meaning, from attached. Attached in this context, because it's used as an adjective, doesn't mean something that happened in the past. It's a positional word. It means that the two things are connected together. It's indifferent to how that came to be. So on page 48 of your brief, you quote the American Heritage Dictionary. Attached simply means not freestanding. I don't think that's quite correct. Because if you look at that dictionary that you cited, the American Heritage Dictionary, that's a definition which is an architectural definition. It's not a general definition. And if you look at the Webster's International Dictionary and OED, the primary meaning of attached is two pieces joined together. So I don't think that the dictionary is helpful to you. I think it's harmful to you. That's quite the opposite, Judge Dyke, because it's indifferent about how the two pieces came to be joined together. I don't think you're answering my question. I mean, the dictionary you cite does not support your proposition. Even if that's architectural, because attached is a term that's used in the architectural context as well, even if we take two pieces joined together, Judge Dyke, which is what you've pulled from the OED and Webster's third, that's still indifferent about how the two pieces came to be joined together. A familiar egg carton, definitely the lid is attached to the egg carton. But whether it's from cardboard or plastic, those are joined together. They are attached. But they were formed from a single piece. Joined together is indifferent to how that came to be. The tines of a fork are attached to the fork. But no one thinks that that means you took each tine and glued it onto the fork. There's lots of examples of banana peel. It's attached to a banana. No, I think the primary dictionary meaning is joining two pieces together that were previously separate. It doesn't say... It may not be determinative as to what it means in the context of this patent, but it's a dictionary matter. Your claim that the dictionary supports your definition is really not true in the case of that dictionary. And in general, it means taking two pieces and joining them together, which is the one example in the specification here is joining by gluing or some other mechanism like that. So if those dictionaries say two pieces that were previously separate joined together, that would be not good for us. But I believe that Your Honor said that it was two pieces joined together. And that simply isn't different where joined's an adjective. They're joined together as opposed to a past act, someone who joined them together. Is it just the difference that attached can be viewed either as an adjective, as you're arguing, or as a past participle, in which case it would be referencing what happened previously, as in this object was attached? Yeah. I think in the context of this claim, it cannot be a past participle because it describes the attached rear cover, not the attached rear cover that was attached. And the state is as it is now. And it's an apparatus claim. It's not a product by process claim. So we decide whether it infringes or we construe the claim according to what the device is, not how it came to be that way. If it were product by process or something else, or it had a step, a method of making or something like that, it might be a different case. But this is an apparatus claim. And when you're talking about attached rear cover, that means it's joined. There's another part that it's hooked to. But it doesn't mean that they were made by separate parts. They could be made integrally. In fact, the absurdity of the contrary view, if the Court would turn to page 38 of our brief, for example, I think this illustrates the absurdity of trying to construe it to be two parts brought together. On the right-hand side, you have the Durr-Bell Cup from our patent, which shows how we make it. And on the left-hand side, you have EFC's Cup. So the way Durr's Bell Cup works is, if you look at it, it's very small. But there's 33 and 26. It sort of makes an R shape on the far right. What page are you on? 38 of our brief. 38. Okay. There's a little 33 and a 26, and they sort of make an R shape. And what happens when we make these is we attach the rear cover, which is that diagonal, onto it. And if you turn to EFC, what they do is they start with sort of a V shape, far left. You can see the hypotenuse and a piece that goes up from that. And then they attach that red piece on the top to complete it. Just to be clear, we shouldn't be interpreting the claims by looking at what the accused product is, right? Exactly. One of the things that I noticed that EFC relied on was the prosecution history, maybe some amendment, changing the words, including, to attach to. Do you have any response to that? Yeah, certainly. Well, if I could finish the thought. But if you look at these two devices, it's very hard to look at and say, gee, the one on the right has an attached rear cover, the one on the left doesn't. Looking at the devices, they're identical. And you can't really say one has an attached rear cover and one doesn't because of the way in which they're made. Turning to the prosecution history, yes, there was a change there, and nothing was attached to the significance of that prosecution history. But it changed some very clunky language with including and attach thereto to just be attached thereto. It was a simplification. I think it's very hard to say that dropping the including, which would be surplus, somehow changed the meaning of that. What about the expert witness exclusion? The standard review on that is quite forgiving. Yes. So that seems to me your biggest challenge is how you get over the standard. Of course, if there's a legal error, Your Honor, in recognizing, for example, it has to be a person of ordinary skill or failing to recognize the correct art, then it would be, then it's a de novo. But in general... Let me ask you, before we get into the nuts and bolts of this issue, if we agree with you on the first two issues, is it necessary for us to address the exclusion of the expert either vis-a-vis the DOA, Doctrine of Equivalence issue, or with respect to other aspects of his testimony? I don't think so, Your Honor, because if the claim constructions change, they're going to have to be new reports, at least in part. And those new reports could either be from Mr. Dottillo or Dr. Akafuwa. Nobody has ever said that Mr. Akafuwa is not qualified. So I think this Court could say, as a matter of judicial economy, just vacate the ruling and see how it sorts out on remand. So the Court could simply decline to address the issue if it changes the claim constructions. Well, we're going to come back on remand and offer the same expert for the same purpose, right? Well, if we do and it's struck, we would be stuck just with Dr. Akafuwa. But for now, we're arguing, and I think we're correct, that Mr. Dottillo is amply qualified as an expert. He was for a decade. Well, I mean, what the district court's theory is that this is somebody expert in design of these atomizers, and he doesn't qualify, which is clearly correct, right? Well, he certainly isn't somebody who designs atomizers. And if this were a patent on, for example, how to design an atomizer, or the patent were about atomization generally, or fluid dynamics, you would want an expert on those things. But the patent is on a particular atomizer, a rotary atomizer for a specific person applying particulate paint. And if you're looking for somebody who understands atomizers for particulate paint, someone who's worked with them for 37 years, someone who is the director of coatings application technology for a decade at PPG, that's technology for applying coatings, technology for applying randomized R&D at PPG for 10 years, including R&D for fundamental paint atomizer research. It's really hard to say he's not ordinary skill, ordinary skill. Maybe he's not Dr. Dong, but this is a patent. Ordinary skill for what? And for somebody making a determination here to design the claimed atomizer, he doesn't have that skill. Well, he certainly does, because what you're looking at are these geometric shapes, and you're asking... He said himself he doesn't, he's not a design expert. No, he doesn't design them himself, but he certainly understands the differences in design from 37 years. When he started out, he tested virtually every type of bell atomizer in existence. But, go ahead. One question I have is about the level of ordinary skill in the art. So, that's a fact finding, right? Fact finding about what the level of ordinary skill in the art is, that would, if it were a clearly erroneous fact finding, that would be an abuse of discretion. What is the argument that it's clearly erroneous? I think there's two things that are critical to this. First, in requiring that he actually be, you know, for example, an expert on fluid dynamics, we have one, that would exclude one of the inventors. One of the inventors, Robert Held, didn't even finish college. There's no way he had classes on fluid dynamics and the abstract mathematics behind it. And if you look at the patent, to see what the patent's about, the patent's not about mathematical equations for fluid dynamics. It's about relatively straightforward impacts of flattening out something that was formerly jagged to drive the paint forward, and the effect of that causing the droplets to be uniform. If the court were to look at the expert report itself, for example, he has a working knowledge, an artisan's knowledge, of what happens based on these geometric shapes. So, for example, if you put to page 6953, he's explaining Rayleigh's theory, which explains how liquids break into ligaments into droplets, and he explains why when you have sharp changes in the surface, you end up with uneven drop sizes. And you can tell, and you take a look, and he has this high flow thing where you see a wave. And he says, look, what happens when you have that wave, you have different sizes in the wave. And when it breaks apart, you get larger and smaller droplets. He's using the standard theories, the things he's worked with 37 years, in order to explain what is happening there. Rule 702 says you can have it from knowledge, experience, training. It mentions academics last. So going back to what a person of ordinary skill needed, and that definition, that fact finding, what are the different factors you should be looking at, and is there anything in the specification that supports that this patent includes matching colors and different things that he might have expertise in? Yeah, so certainly the patent is all about matching colors. So, for example, it starts and says, Rotary atomizer for particulate paints. It's about particulate paints, which have the mica in them. And then you look at it, it says, first sentence of the abstract. It's not just about matching colors, it's designing an atomizer that helps to match colors. Right, it's Rotary atomizer applies particulate paints with good color matching. So it's about an atomizer that can achieve good color matching. That's very different from Dr. Dom, a rotary atomizer in order to cause, you know, even explosions from jet fuel. This is about getting the paint mica to be uniform and to lie flat on a surface as it's drying. Very, very different purpose. What was your definition of a person of ordinary skill in the era that you proffered? Yeah, so our definition of ordinary skill was very lengthy. It went through 15 years of that, 14 years of that. But I think it just comes down to someone who has, based on decades of experience, for example, of experience attempting to, of working with rotary atomizers of different sizes so that they can explain to the jury why it produces good color match, why it's uniform, why you get the droplets. Many times we see situations where the district court has adopted, it's either someone who has a particular education or someone who has experience in the industry and you can have either or. Did you offer an either or definition? Yes, we offered an either or and we used experience in the industry because, frankly, Mr. Datillo isn't an academic. If you ask him about the mathematics of thermodynamics, that's not where he is, or excuse me, of fluid dynamics, that's not where he is. But he has a working knowledge of those things from those 37 years of experience that began with working in a paint lab testing these things out. That type of experience. And he has, based on that practical experience, an ability to explain to the jury exactly why you would, with particular shapes, get uniform drop size, of the right size to ensure that the mica goes on evenly, or why you wouldn't. Because it causes things to not have the laminar flow. Because it causes undulations in the way that the fluids flow. You need a thin flow, you need it at the proper speed, and you need it not to be turbulent. And he can explain exactly why this patent achieves that. Okay, I think we're out of time. Thank you so much. Thank you. Good morning. Thank you, Your Honor. In Durer's briefing and in the argument this morning, they suggest that these patents, this case, is about color matching or painting of automobiles. But I think, as was hinted during the questioning, that's not really the case. Durer didn't invent color matching. That's not what these patents are about. That's not what this case is about. The patents are very clear that they relate to rotary atomizers. So the problem confronting an inventor looking at this problem wasn't how to achieve color matched paint on cars. Durer's briefing says that had been done for many years, decades, before these patents existed. The problem that the inventors faced was how to design a rotary atomizer to apply atomization to a particular surface in a given way. Mr. Lampkin said if this were a patent on how to design an atomizer, then design experience would be relevant. This is a patent on how to design an atomizer. That's exactly what this patent is about. If you look at the patent, it's very clear, the title. The first sentence of the specification in the background is, the present invention relates generally to rotary atomizers. The claims don't relate, for the most part, to paint, certainly not to metallic paint or painting automobiles or color matching. What they all relate to is the specific geometric design of a rotary atomizer to achieve a particular result. And rotary atomizers have been in use for a long time. I thought like the first sentence of column 11, it's a summary of the invention. The present invention provides rotary atomizer which provides improved color matching. I just want to make, I'm just, I don't know that I don't see where it's not referring to color matching. Oh, it certainly refers to color matching. But that is the purpose of the improved, it's improved in the sense that it provides improved color matching. Right? Do I understand? It's actually, right, more technically it's improved in that it provides a better droplet size deviation. And because of that, it can be used to improve color match. That's really, if you read the body of the application, what it really talks about is how changing the geometric shape of the atomizer device allows a more narrow droplet size deviation. And because of that, they were able to achieve better color match. So again... And why is it Victor's expert couldn't talk about that when he was, a lot of his expert opinion goes to the droplet size? Yeah, but the issue here, if you read the claims of the patent, they don't talk about droplet size hardly at all. What the claims talk about is the specific geometric features, the engineering design features of the atomizer device that had been created. And so a person of ordinary skill in the art has to be able to compare accurately the design features of one device to another and understand how those design features impact atomization. And Mr. Dottillo simply doesn't have any expertise in that. He admitted that he's never designed a rotary atomizer. He has no experience in atomizer design. His experience is in assessing paint quality after an atomizer has been used. But that doesn't allow him to determine the differences, geometric engineering differences between atomizer devices. It just doesn't. And the district court's analysis was very thorough. Certainly, there was no clear error in their assessment, and it's not an abuse of discretion for them to make a determination that the field of art here is rotary atomizer design, as the patents make very clear, and that to be a person of ordinary skill in rotary atomizer design, you have to have some experience in designing a rotary atomizer. I think to go the other way would be effectively to say, if you're looking at the Exmark case, that a landscaper who knows how to use a lawnmower and can assess how well it cut a lawn would be a person of ordinary skill in designing components of a lawnmower, and that's clearly not correct. If we disagree with you on the two claim construction issues, then presumably we have to send the case back, right? This would not be a case in which we could affirm based on the ruling with respect to the expert alone, I take it. Certainly, the ruling on the expert is still important, even if we were reversed on claim construction. What would you envision would occur back in the district court? Could the plaintiff, for example, get another expert and proceed without the burden of the district court's ruling on the current expert? Well, the lower court granted summary judgment of non-infringement for doctrine of equivalence based on the fact that they don't have sufficient evidence to prove doctrine of equivalence. But if we send it back, where would we be with respect to both literal and doctrine of equivalence is what I'm really asking. Yeah, and I think the answer on doctrine of equivalence is the grant of summary judgment would stand. Doctrine of equivalence is out of the case. The lower court granted summary judgment of non-infringement of doctrine of equivalence not based on claim construction. It was unrelated to claim construction. So certainly, the grant of summary judgment of non-infringement under doctrine of equivalence should stand. And I think the lower court would then have the ability to make the decision on whether the summary judgment of non-infringement of literal infringement would stand as well because the cases are clear that in most cases, though not all, you do need expert testimony to prove infringement, even literal infringement. And they simply don't have an expert. They don't have even a person of ordinary skill in the art who can testify to infringement or to invalidity. So I think the answer is it's important to rule on both issues. And if the expert is excluded, as he should be, then non-infringement under doctrine of equivalence stands. And it would be up to the district court to decide whether literal infringement exists. And I think the lower court would be able to decide on its own to manage its own case and decide whether it was going to give Durer another bite at the apple and let them mulligan all of the expert's things to date and go back. Or if the deadline for submitting an expert and identifying experts has long passed and that they're stuck with the expert that they have or the non-expert that they have. Could you address the two claim construction issues? Sure. So the first claim construction, the substantially conical, Durer goes back and first starts to look at the construction of the word conical, not generally conical. And Mr. Lampkin said that the lower court said that conical means resembling a cone. And he equates that to approximating a cone. That's not what the lower court said. The lower court said a cone is a widely recognized shape and then clarified that a cone has a smooth and continuous surface with a constant flow angle. So it's pretty clear the lower court correctly said the plain and ordinary meaning of conical is a cone shape. And what Durer's asking this court to do is to construe that term not to mean a cone shape, but to mean a cone and shapes that are sort of similar to a cone. And they don't cite to any rational basis of why that's the right thing to do. Well, except for the language of the claim about generally. Well, certainly, once you get to generally conical, that would be a different thing. But conical in and of itself, I think it's clear that the plain and ordinary meaning of conical is cone shaped. And Durer's argument is that even that should be allowed to have some curvature. And I think that's incorrect. Isn't it just necessarily going to require some deviation from the perfect shape of a cone? And nothing in the physical world is a straight line. Nothing in the physical world is a perfect circle, although my geometry teacher could come pretty close. But there's no such thing in the real world as a perfect cone. So you're going to have some deviation anyway. Isn't that, and then when you add generally into it, it seems to me you've got some significant flexibility as to the particular portion of the surface that we're looking at as conical. Well, I think importantly the patentee here chose to give some definition to what substantially conical means. The patentee didn't say substantially conical and sort of let that ride as a plain and ordinary meaning. Instead, the patentee made certain distinctions about what is within and is not within the term generally or substantially conical. The patentee said very clearly that it includes multi-cone surfaces, double conical surfaces. And I don't think that under a general plain and ordinary meaning of substantially conical you would typically include a double conical surface. I don't think that would fall within the definition. But the patentee chose to define it that way. And then the patentee chose to make arguments to distinguish what they had developed from the prior art. And the arguments that the patentee made they're stuck with now. They can't now go back and try to argue that they were different or that they should be narrowed in some way. The patentee's arguments were very clearly that undulations and curves are not a substantially conical surface. The Schneider 487 cup that was cited is a multi-cone surface. It has conical sections, and then it also has undulations, meaning it goes from high to low to high angle, and it has curves. And it's actually the curved section that the patent office pointed to. They said reference numeral 24.2, which is the curved portion, is a substantially conical overflow surface. And the patentee said that's not correct. It's not a substantially conical overflow surface. And the patentee focused on the fact that it's that portion that approaches the spray edge that is not substantially conical. And even went so far as to say that the examiner's assertion that Schneider 487 is substantially conical essentially reads out the meaning of conical entirely. The patentee was clearly focused on conical sections, not curves, not wave-like sections where it goes from areas of high to low angle. And that's the patentee's arguments that they're stuck with today. Now, Durer tries to recast that argument and say that Schneider 487 had a lip, and that was the distinguishing feature, but that argument doesn't appear in the record. That's not what Durer said. What they said was that portion that you've pointed to, examiner, that curved portion, 24.2, is not a substantially conical section. And they didn't then define it any further than that. They didn't go on to say it's not substantially conical because it has an angular change of X degrees. They didn't say it's undulating because it has a flow change of X degrees. They could have done that, but they chose not to. And so their disavowal is going to be commensurate in scope with their arguments. And their arguments were against curves in general and undulations in general. How could something be double conical but not have some sort of curve or undulation? Well, undulation would be high to low to high angle. Just high to low or this to this wouldn't be an undulation. That would just be an angular change. So I think undulation by its very definition means it has to go from a higher angle to a lower and then higher. So curves, there are examples. And, in fact, if you look at the Schneider 487 cup, the angular change between the conical portions and the flat portions is relatively strict. There's no large curve to that. So I do think you can make, and, in fact, there was evidence in the case that was discussed about prior. Why do you think there's no large curve? Is it because it's such a dramatic change? Yeah, dramatic angular change. I agree with you. And I do think your point is that maybe there's some issues within the patent that they seem to be including certain things that maybe they wish they excluded. But the patentee is free to be their own lexicographer and is stuck with the language that they choose to use. And, in this case, they said double cones are okay and curves are not. And that is then the definition of what these terms mean. And a person skilled in the art should be allowed to look at the words that the patentee used, what they have decided is in and outside of the scope of the claims, and rely on that. They have to have some basis for understanding what the scope of the claims is. And it's got to be based on what the patentee said. What about attached? For the attached rear cover, effectively what DUR is trying to do is use claim construction to capture EFC's design, which is unquestionably different. As Mr. Lampkin pointed out, you can look at those pictures and see that the EFC bell cup uses a completely integral bell cup where the hub, the rear surface, the spray edge is all one piece. And then EFC inserts, places a overflow surface insert on the front, which allows them to change the shape of the bell cup by using an insert of choice. That design is not shown anywhere in these patents. It's simply not in there. Well, suppose, though, that the two finished products were as identical as two products can be, but it happens that one of them was made integrally and the other was made by joining. Would your argument still be that the two products are different because the bell bottom, the bottom is attached in one case and not in the other? It's not necessarily the manner of construction. Well, that's what I'm trying to get at. Why isn't it? I mean, it seems to me that your argument about the word attached necessarily is relying on the notion of how this was constructed. Because otherwise, in my example, for example, why is that not exactly the same product even though you got there by a different path? Well, because structurally they are different. Well, you're saying in this case you say they are different. Right. But the term attached, it seems to me, are you saying that in my example the case in which they were put together was one in which they were attached and the one in which it was integral was not and that that would be enough to differentiate the two? They could be, but it's tough in the abstract, in a vacuum, to say. Certainly in the case of this patent, where you're looking at a person of ordinary skill in the art of rotary atomizer design, looking at what is said in this patent, I think it's clear that if the rear cover was a separate piece that is secured to the bell cup to create the rotary atomizer, then that's different. And so that's what's covered. And what's not covered is a structure where the rear portion is integral to the bell cup. Even if the finished products in each case are exactly the same. But the problem is they're not exactly the same. My hypothetical, they are, and I didn't make the hypothetical. And I appreciate that, and that's what I'm saying. It's hard to say in a vacuum. So I guess in a vacuum, yes, I would agree that it would be tough to say that one of those is attached and the other is not. But the test is not looking as a layperson in a vacuum. It's looking as a person of ordinary skill in the art in view of this patent. And in that case, I think it's clear that the rear cover has to be a separate piece that is attached to the bell cup, and that collectively makes the rotary atomizer. I want to ask you a couple questions about that. I mean, looking at the intrinsic evidence, you do have some examples in the specification where it says glued. I forget what the other ways are. Welded. Welding. Welding. Yes. Welded. And there's no example where it's integrated. Correct. We're not supposed to read examples into the claims, right? I agree with that. You're not supposed to read examples into the claims, but you do have to read the claim terms in view of the specification as a person of ordinary skill in the art would do. And here, there is simply no support for an integral rear portion. There's nothing that would suggest— it's really important for the working of the invention that it be attached later or attached by being welded or glued. I think what the specification says is that it's really important that the bell cup be hollow. And then the only way that they say to make a bell cup hollow is by attaching a rear cover. So it sort of ties into a 112 argument. There's simply no written description or enablement. You're saying a person of ordinary skill in the art wouldn't know how to make an integral rear cover that creates a hollow space. Is that what you're saying? And if you are, did you present expert testimony to that effect? I'm saying that that is factually true in this case. And in fact— Based on what? It became apparent that EFC's design was better than Durst's design. What evidence? I mean, you can't sit here and testify to that. I don't know that there's any evidence in this record that shows that. I think the evidence in this record is that the hollow bell cup was important and that the only way they say to do it is by attaching a separate piece. I just want to point out, the claim says a rear cover attached to the bell cup, and then it goes on to tell me more about it. It says such that, and I think such that, talking about how it's attached, such that the atomizer is hollow. So why wouldn't any way of attaching it such that the atomizer is hollow be sufficient? I think any way of attaching a separate piece is sufficient, but I think the claims and the specification make a clear distinction between parts that are included that are integral and a separate piece that is attached. And remember, if you read that claim, it's clear that it's a two-component system. It's a rotary atomizer that has a bell cup, and then attached to the bell cup is a rear cover. So it is a two-component system very clearly just based on the claims. We do get a lot of claims where there might be a lot of different components, but yet they're all integrally connected to one another. Like, say, a bicycle. A bicycle has a seat that's probably attached. A bicycle including a seat, including a horizontal bar, including a diagonal bar. Now, it might be that the horizontal bar and the diagonal bar are separately. They're integral, right? But are you telling me that whenever I read a claim, whenever I see things built out in separate paragraphs like this, I'm supposed to understand that they are mechanically distinct from one another and then attached? No, I think your example, though, shows exactly what's going on here. If it was a bicycle including piece A, including piece B, and including piece C, they could be integral or they could be attached. But that's not what this claim says. It says a rotary atomizer that has a bell cup that includes a front surface, an overflow surface, a deflector. Those could be integral or attached. And then it says attached to that bell cup is a rear cover. And it's the distinction between a piece being attached, which indicates that it is a separate piece that's been secured to it, or saying they could have chosen to say that it's integral. But that goes back to how it was made, which you started off by saying that doesn't matter. What I am trying or what I tried to say, and maybe I didn't say it clearly, was that it's not how it's made, but it does relate to the structure in the end. So, yes, I guess ultimately how it's made relates, but it's a structural claim. What's that? Even if the two structures are identical, they're distinguished by how they were made. That's what you're saying, I think. I am, except that they're not. That's the problem, is that the two structures are not the same. It's because if it's a— Which two structures are you talking about? The two structures of if you had an integral rear cover versus an attached, a separate attached rear cover. The two structures are not the same. There are structural differences that impact the strength, that impact the thickness of the various pieces. There is testimony in this case that discusses the structural differences between EFC's bell cup, which uses an integral rear piece, and DER's bell cup, which uses an attached rear cover. And because of that attachment, they are structurally different. Thank you.  Thank you, Mr. Warren. Thank you. Mr. Lambkin, you have two minutes. Thank you. I'd like to start with just a brief clarification regarding the district court's determination of what substantially conical meant. Page 64 of the appendix doesn't say it has to have a constant slope. That was EFC's argument. He just simply says resembling a cone like a party hat, like a traffic cone, like other things that are familiar. We're going to, I think, start with the disclaimer, the argument that somehow we disclaimed any curve no matter how insubstantial. I don't think you can get that out of the language of the prosecution history. If, for example, the court were to turn to page 2588, it talks about, and it has a picture of the Schneider device, and it talks about the substantially conical portion not extending all the way to the spray edge. But if you look at the edge, the point they're talking about near the spray edge, it is a very dramatic curve. So at that point, it doesn't really look like a cone at all. It looks like if you extended it, you would end up with a bubble or half a sphere. It simply isn't conical. It's too curved. Substantially conical would tolerate some curvature so long as it still substantially resembles a cone. So Mr. Bliss says with respect to attached, he says there's some features here which are described as included, in which event they don't have to start out as separate pieces, but the use of attached with respect to the rear cover has some significance under those circumstances. What's your response to that? Included simply means it exists. It doesn't give a relationship in terms of where they are in space. Attached means they're next to each other, and you can't pull them apart. It means connected to. Two things can be included. The wheels are included in the car. The steering wheel is included in the car, but they aren't necessarily attached to each other. They're just both included. When you talk about something being attached, it means that it is connected to, and so even if you have things that were integrally formed like my egg carton, the carton and the hinge and the lid, they're all attached to each other, even though integrally formed. Turning briefly to the expert, I think the problem with the district court's definition is it excludes one of the inventors. Robert Held required experienced designing atomizers. Robert Held had never designed an atomizer before. Background in fluid dynamics. Robert Held had not graduated college. Why do all the inventors have to be skilled in a particular art? They may make different contributions. There are plenty of cases that say that. Certainly, but there's simply no evidence that Robert Held wasn't a huge contributor to the actual design of the device. Ordinarily, if you're going to exclude the inventors, much less one of the key inventors, it's probably not the right definition. But the record doesn't show what his contribution was. They certainly had the opportunity to depose him on that, and that he was the only inventor they deposed, and there's no indication that he just, for example, was a guy measuring droplet sizes, which is really quite critical here. I think we're out of time. Thank you. Thank you. Thank you. Thank you both.